1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8                         DISTRICT OF OREGON

9                         PORTLAND DIVISION

10

11

12  DOMINIC FAGUNDES,                      No. 3:12-cv-01202-HU

13           Plaintiff,                              **OPINION AND**
                                                         **ORDER**
14       v.

15  DR. CHRIS DIGIULIO, and
    MS. CAZIER,
16
             Defendants.¹
17  ────────────────────────────

18  Dominic Fagundes
    45500 Hebo Rd.
19  P.O. Box 68
    Grand Ronde, OR 97347
20
             Pro Se Plaintiff
21

22  Robert E. Sullivan
    Oregon Department of Justice
23  Trial Division
    1162 Court Street NE
24  Salem, OR 97301-4096

25           Attorney for Defendants

26  ────────────────────

27       ¹ The Clerk of Court is directed to correct, on this Court's
    docket, the spelling of Dominic Fagundes's name and Chris
28  Digiulio's name, as reflected in this Opinion and Order.

    Page 1 - OPINION AND ORDER

HUBEL, Magistrate Judge:

Plaintiff Dominic Fagundes ("Plaintiff") brings this 42 U.S.C. § 1983 action against Defendants Chris Digiulio ("Digiulio") and Ellen Cazier ("Cazier") (collectively, "Defendants"), a physician and nurse at Deer Ridge Correctional Institution ("DRCI"), respectively, alleging an Eighth Amendment claim based on inadequate prison medical treatment. Specifically, Plaintiff claims that Defendants exhibited deliberate indifference to his serious medical needs by confiscating his wheelchair. As explained further below, Plaintiff has not presented evidence that raises a genuine issue of fact suggesting Defendants' response to Plaintiff's medical needs was deliberately indifferent. Accordingly, Defendants' motion (Docket No. 49) for summary judgment is granted and this action is dismissed with prejudice.

## I. FACTS AND PROCEDURAL HISTORY

In December 2008, Plaintiff was involved in a motor vehicle accident and sustained numerous injuries, including fractures of both legs and his pelvis necessitating open reduction and internal fixation ("ORIF") surgery. (Digiulio Decl. Attach. 2 at 4-5, 92, 94-95, 248.) Over a year and a half later, on July 14, 2010, Plaintiff was transferred to the Coffee Creek Correctional Facility ("CCCF") from the Polk County Jail, where had he been imprisoned since April 2010. (Digiulio Decl. ¶ 3, Attach. 2 at 382.) "A cautionary note on [Plaintiff]'s problem list upon transfer from county jail to the [CCCF] Intake Center indicate[d] he received

methadone while at [the] county jail and [that he] is prone to seek more and more methadone."[2]  (Digiulio Decl. ¶ 7, Attach. 2 at 1.)

Immediately upon his arrival at the CCCF on July 14, 2010, Plaintiff reported mobility issues, chronic pain and an inguinal hernia, and his treating physician "ordered restrictions of low bunk, no stairs, and the use of a wheelchair for one year." (Digiulio Decl. ¶¶ 6-7, Attach. 2 at 50.)  About two months later, on September 3, 2010, Plaintiff was transferred to DRCI in Madras, Oregon.   (Digiulio Decl. ¶ 3.)   Plaintiff submitted an inmate communication form that same day, stating: "I have . . . approval for [the] Shutter Creek [Alternative Incarceration Program or] AIP [p]roviding I get your approval as its [sic] not wheelchair friendly, [and] I can walk on a cane." (Digiulio Decl. Attach. 2 at 382.)   The medical department at DRCI received Plaintiff's inmate communication form or "kyte" on or before September 7, 2010, when it made a note in Plaintiff's medical file.  (Digiulio Decl. Attach. 2 at 10.)

The next day, on September 8, 2010, the chief medical officer at DRCI, Digiulio, examined Plaintiff based on reports of chronic pain.  (Digiulio Decl. ¶¶ 1, 9.)  According to Digiulio, the

> examination revealed that [Plaintiff's] vital signs were stable, his lower back contained a surgical scar in a vertical fashion over the lumber region and he had a horseshoe-shaped scar over his left hip. There were a few scars along his left lower extremity. He had muscle atrophy in the left lower calf and scarring over the anterior surface of the shin. The quadriceps musculature and hamstring were intact. The left leg full range of motion was asymmetrical compared to the right side hip and knee and was neurovascularly intact.

---

[2] The medical records reveal that Plaintiff also has a history of heroin addiction.  (Digiulio Decl. Attach. 2 at 30.)

Page 3 - OPINION AND ORDER

(Digiulio Decl. ¶ 10.)  Digiulio's "assessment was that [Plaintiff] was given morphine and Vicodin at the CCCF Intake Center with very little in terms of objective findings or history documentation," and "his pain management regimen between the time of his accident in 2008 and his incarceration [wa]s sketchy at best."  (Digiulio Decl. ¶¶ 11-12, Attach. 2 at 10.)  Digiulio thus "recommended a plan of care to discontinue the wheelchair [in order to improve Plaintiff's mobility by walking and using a cane], continue [Plaintiff] on Naprosyn, increase Elavil to 75 m[illigrams] and obtain old [medical] records."[3]  (Digiulio Decl. ¶¶ 12, 14.)

Digiulio also discussed the need to discontinue the use of a wheelchair with Plaintiff during their September 8, 2010 consultation, and Digiulio's treatment notes include a reference to "DC wheelchair."  (Digiulio Decl. ¶ 14, Attach. 2 at 10; Cazier Decl. ¶¶ 7, 11.)  Digiulio, however, concedes that he did not write "an order discontinuing the wheelchair" until October 13, 2010.  (Digiulio Decl. ¶ 15, Attach. 2 at 52.)  At that time, Plaintiff "was able to walk with the aid of a cane [which was already in his possession] and [he] had left the wheelchair unattended on two or more occasions creating a security concern."  (Digiulio ¶ 15, Attach. 2 at 12-13; see also Cazier Decl. ¶¶ 8-9.)  Cazier confiscated Plaintiff's wheelchair on the same day Digiulio issued his written order, and two days later, on October 15, 2010, Digiulio wrote "an order authorizing the use of a cane for three

---

[3] An ODOC technician was ultimately unable to obtain pre-incarceration medical records regarding Plaintiff's pain management based on the information provided by Plaintiff.  (Digiulio Decl. Attach. 2 at 275-76, 371-72, 375.)

months."[4] (Digiulio Decl. ¶ 16, Attach. 2 at 12, 369; Cazier Decl. ¶¶ 13-14.)

On October 25, 2010, Plaintiff "was seen by nursing staff for medication and requested his wheelchair be returned. He was instructed to sign up for sick call but did not follow up with this request." (Digiulio Decl. ¶ 17, Attach. 2 at 13.) A little over a month later, on December 4, 2010, Plaintiff informed a registered nurse at DRCI that he "want[ed] clearance to do stairs [because he] want[ed] to go to [Shutter Creek] AIP." (Digiulio Decl. Attach. 2 at 14.) Then on December 29, 2010, Cazier sent Plaintiff an inmate communication response explaining that his stair restriction expired in October and that "[t]he only notations on [his] Health Statute [we]re for lower bunk and a cane." (Digiulio Decl. Attach. 2 at 367.)

On February 2, 2011, Plaintiff followed up with the medical staff regarding his inguinal hernia. (Digiulio Decl. Attach. 2 at 14.) That same day, Cazier sent Plaintiff an inmate communication response stating: "[Y]our low-bunk status and use of the cane ha[d] be[en] re-ordered for [one] year. You will also be scheduled for a follow-up appointment with the [d]octor regarding your hernia."[5] (Digiulio Decl. Attach. 2 at 363.) Six days later, on February 8,

---

[4] As discussed *infra* Part III, portions of Cazier's declaration not cited by the Court in this background section include typographical errors regarding the date of confiscation. Nonetheless, Plaintiff's amended complaint and other record evidence reveal that his wheelchair was indeed confiscated in mid-October 2010.

[5] Plaintiff ended up using a cane throughout the remainder of his period of incarceration at DRCI, which ended on November 19, 2013.

Page 5 - OPINION AND ORDER

2011, Digiulio wrote an order authorizing Plaintiff to perform "light duty work for one year with no lifting over twenty pounds and no hurrying required." (Digiulio Decl. ¶ 20.)

Nearly two months later, on March 30, 2011, Plaintiff was seen by Rodney Buzzas ("Buzzas"), M.D., regarding his hernia and elected to have it surgically repaired. (Digiulio Decl. Attach. 2 at 231, 235.) Notably, Plaintiff denied any painful or stiff joints, muscle cramps, or back pain during his consultation with Buzzas. (Digiulio Decl. Attach. 2 at 236.) On April 10, 2011, Plaintiff sent an inmate communication form to the medical staff at DRCI indicating that his pain medication was no longer sufficient and that he "continue[d] to have exc[r]uciating pain in [his] legs [and] ankles." (Digiulio Decl. Attach. 2 at 360.) Plaintiff was told to sign up for a "sick call," but it does not appear that he did so. (*See* Digiulio Decl. Attach. 2 at 18, 360.)

On May 6, 2011, Plaintiff's hernia surgery was performed by Buzzas and "[t]here were no identifiable complications." (Digiulio Decl. Attach. 2 at 240.) About three months later, on August 12, 2011, Plaintiff continued to complain about the ineffectiveness of his pain medication and that his wheelchair had been confiscated. (Digiulio Decl. Attach. 2 at 20.) The medical staff at DRCI took Plaintiff's leg measurements three days later, on August 15, 2011, which showed a one-inch discrepancy between Plaintiff's left and right leg. (Digiulio Decl. Attach. 2 at 20.)

On September 9, 2011, Plaintiff sent a kyte to the medical staff asking whether Digiulio had ordered a medical shoe and heel lift for his right leg. (Digiulio Decl. Attach. 2 at 351.) Plaintiff reported that he had been using a cane and performing

Page 6 - OPINION AND ORDER

"some exercise." (Digiulio Decl. Attach. 2 at 351.) Four days later, on September 13, 2011, Plaintiff sent a kyte to the medical staff asking to cancel the weekly weight sessions ordered by his physician because he had only lost three pounds and because he thought he might slip and fall once it became icy outside. (Digiulio Decl. Attach. 2 at 350.) Plaintiff was informed that he would have to sign a refusal of treatment in order to cancel his workout sessions. (Digiulio Decl. Attach. 2 at 350.)

On February 15 and February 27, 2012, Plaintiff reported chronic pain in his legs that was exacerbated by the winter conditions. (Digiulio Decl. Attach. 2 at 23.) Plaintiff's complaints continued throughout the coming months and were often times accompanied by requests to alter his pain medications. (Digiulio Decl. Attach. 2 at 23-25, 337.) In late May 2012, Plaintiff received orthotics and a leg brace from Digiulio. (Digiulio Decl. Attach. 2 at 25, 334.) The medical records also continued to reflect that a wheelchair was not medically necessary. (Digiulio Decl. Attach. 2 at 27.)

On June 5, 2012, Plaintiff reported that his leg "brace d[id] not fit in [his] tennis shoe" and, at sometime prior to July 9, 2012, an order was placed for medical shoes that would accommodate Plaintiff's brace. (Digiulio Decl. Attach. 2 at 26-27.) On June 16, 2012, Plaintiff sent a kyte to medical staff requesting that his wheelchair be returned because he continued to have increased leg pain. (Digiulio Decl. Attach. 2 at 332.) On June 27, 2012, a registered nurse informed Plaintiff that Tramodol was strongest medication Digiulio was willing prescribe for Plaintiff's chronic pain. (*See* Digiulio Decl Attach. 2 at 330.) Two days later, on

Page 7 - OPINION AND ORDER

June 29, 2012, Plaintiff was provided with the names of the physicians on the Therapeutic Level of Care ("TLC") Committee (Digiulio et al.), per his request. (Digiulio Decl. Attach. 2 at 329.)

On July 1, 2012, Plaintiff requested that his wheelchair be returned because his was having increased pain and swelling in his legs. (Digiulio Decl. Attach. 2 at 328.) Plaintiff was informed that needed to sign up for a sick call if he was experiencing worsening symptoms. (Digiulio Decl. Attach. 2 at 328.) Four days later, on July 5, 2012, Plaintiff filed this § 1983 action against Defendants and the superintendent at the DRCI, Joe DeCamp ("DeCamp"), alleging three Eighth Amendment claims based on inadequate prison medical treatment. (Compl. at 4-7; Order Proceed IFP & Dismiss at 2-3.) On July 30, 2012, Digiulio made entry in Plaintiff's progress notes stating that he would not authorize the use of a wheelchair at that time. (Digiulio Decl. Attach. 2 at 28.)

On August 1, 2012, Plaintiff reported continuing pain despite the fact that he had been wearing his leg brace as directed. (Digiulio Decl. Attach. 2 at 28.) Plaintiff therefore requested "a better pain med[ication] than the tram[o]dol." (Digiulio Decl. Attach. 2 at 28.) An August 1, 2012 progress note indicates that Digiulio was consulted and said Plaintiff should continue his current treatment plan. (Digiulio Decl. Attach. 2 at 29.) On August 8, 2012, a registered nurse sent Plaintiff an Inmate Communication Response, stating:

> The provider has been consulted. Ultram has been prescribed for your pain management in addition to other medications. If you feel Ultram is ineffective, please

Page 8 - OPINION AND ORDER

1

let us know so we can remove it from the plan of care.
2
You are encouraged to continue lifestyle modifications
and practice comfort measures to help your medications
3
have maximal effect. If you need advice on lifestyle
modifications and comfort measures, we will be glad to
assist you.

4

5
(Digiulio Decl. Attach. 2 at 324.)

6      On August 15, 2012, Plaintiff requested the return of his

7 wheelchair and reiterated that his pain medication was adequate at

8 the other facilities——namely, the facilities that prescribed

9 Plaintiff methadone and/or morphine. (Digiulio Decl. Attach. 2 at

10 30-31.) That same day, a registered nurse advised Plaintiff that

11 he needed to consistently take Ultram in the prescribed dosage

12 (i.e., three time per day instead of once per day as Plaintiff had

13 done "for the most part") since he continued to complain of pain.

14 (Digiulio Decl. Attach. 2 at 323.) Plaintiff was also informed

15 that a wheelchair was not authorized at that time. (Digiulio Decl.

16 Attach. 2 at 30.) On August 31, 2012, after Judge Anna Brown

17 issued an initial screening order, Plaintiff filed an amended

18 complaint in this proceeding. Plaintiff's complaints of chronic

19 pain and inadequate pain medication continued unabated thereafter.

20 (Digiulio Decl. Attach. 2 at 30-36.)

21      In September 2012, Plaintiff requested morphine and methadone

22 but was informed by Digiulio during a consultation that he would

23 not be resuming narcotic pain medications. (Digiulio Decl. Attach.

24 2 at 30-31.) On October 2, 2012, Plaintiff completed an Inmate

25 Communication Form indicating that he was interested in Digiulio's

26 offer to potentially set up physical therapy appointments so

27 Plaintiff could strengthen his legs and pelvis. (Digiulio Decl.

28 Attach. 2 at 319.) Two days later, a registered nurse sent

Page 9 - OPINION AND ORDER

Plaintiff a pamphlet of lower back exercises and instructions, which had been reviewed and approved by a provider. (Digiulio Decl. Attach. 2 at 304, 307.) Nearly two weeks later, on October 15, 2012, Judge Anna Brown issued a second screening order dismissing DeCamp as a named defendant as well as two of Plaintiff's Eight Amendment claims, pursuant to 28 U.S.C. §§ 1915A and 1915(e)(2).[6] (Order at 2, 5, "Plaintiff's amended complaint shall proceed on plaintiff's first claim for relief only, against defendants Degulio and Cazier [based on the confiscation of his wheelchair].")

On November 5, 2012, the medical staff at DRCI educated Plaintiff on the importance of physical exercise (e.g., walking and stretching) while staying within his physical limits. (Digiulio Decl. Attach. 2 at 33.) In mid- to late November 2012, Plaintiff experienced pain and swelling in his lower leg and foot due to an ingrown toenail. (Digiulio Decl. Attach. 2 at 33-34, 302.) Around the same time, based on continued complaints regarding Digiulio's decision to only prescribe non-narcotic pain medications, Plaintiff was informed that "medications are prescribed based on professional judgment at the discretion of the provider," and that "the provider specifically [stated in Plaintiff's chart] that [he was] to continue with [his] current treatment plan." (Digiulio Decl. Attach. 2 at 301, 303.)

On December 5, 2012, Plaintiff complained of bilateral lower leg pain and pain on the left side of his pelvis, which was

---

[6] Plaintiff's second claim for relief was the only cause of action that specifically concerned the alleged denial of adequate pain medications.

Page 10 - OPINION AND ORDER

exacerbated by the winter conditions, and once again requested a stronger pain medication. (Digiulio Decl. Attach. 2 at 35.) Although the nurse observed that Plaintiff moved in a "slow" and "painful" manner, she noted that "the provider ha[d] made several written orders stating that the patient will not be given narcotics and that he is to continue with the prescribed medical regime." (Digiulio Decl. Attach. 2 at 35.) On December 17, 2012, a nurse completed a progress note indicating that Plaintiff was given the opportunity to seek a second opinion regarding the adequacy of the pain treatment he had been offered that fall, and that Plaintiff declined to do so based on the assumption that physicians employed by the Oregon Department of Corrections ("ODOC") would not disagree with one of their own colleagues. (Digiulio Decl. Attach. 2 at 36.) On December 21, 2012, Digiulio made an entry in Plaintiff's progress notes stating that narcotic pain medications were not medically indicated and that Plaintiff was to continue focusing on improving his functionality, range of motion, and activities of daily living. (Digiulio Decl. Attach. 2 at 37.)

On January 11, 2013, Plaintiff requested an increased dosage of pain medication (Tramodol) because the "cold weather [wa]s making [his] pelvis and knee hurt more." (Digiulio Decl. Attach. 2 at 37.) A medication order was placed that same day. (Digiulio Decl. Attach. 2 at 37.) On January 23, 2013, Plaintiff asked to take his Tramodol dosage in the morning because taking it in the evening disrupted his sleep. (Digiulio Decl. Attach. 2 at 37-38.) Plaintiff reported that he was able to sleep normally when he elected to skip his Tramodol dosage in the evenings. (Digiulio Decl. Attach. 2 at 38.) Plaintiff's request was approved that same

Page 11 - OPINION AND ORDER

day and it appears that he began taking Tramodol at or before noon each day. (Digiulio Decl. Attach. 2 at 38.)

On February 13, 2013, Plaintiff complained of pain in his left hip and inquired about a heel lift. (Digiulio Decl. Attach. 2 at 38.) On February 25, 2013, the medical staff informed Plaintiff that he was being scheduled for an orthopedic consultation, and that his provider declined to make any changes to his pain medications at that time. (Digiulio Decl. Attach. 2 at 39, 294.) A little over two weeks later, on March 14, 2013, Plaintiff was seen by Adam Short ("Short"), a certified physician's assistant at Desert Orthopedics in Bend, Oregon. (Digiulio Decl. Attach. 2 at 39, 248.) Short's treatment notes state, among other things:

> I did provide [the patient] with a heel lift today. I did recommend the [continued] use of an [Ankle Foot Orthosis] brace on the left leg as much as possible to help with his gait. I also recommended physical therapy working on soft tissue stretching techniques. Regarding his hip posttraumatic arthritis, at some point, he may benefit from an intra-articular injection.

(Digiulio Decl. Attach. 2 at 250.) Plaintiff picked up the heel lift and insoles from the medical staff at DRCI the following day. (Digiulio Decl. Attach. 2 at 40.)

On April 29, 2013, the parties consented to the exercise of jurisdiction by a magistrate judge in this proceeding. A little over a week later, on May 8, 2013, Plaintiff reported increased pain in his left hip when walking laps at DRCI, and that Tramodol was only effective for one to two hours. (Digiulio Decl. Attach. 2 at 41.) Plaintiff was told to continue his medications as directed and educated on the importance of performing exercises that would improve his strength and range of motion. (Digiulio Decl. Attach. 2 at 41.)

Page 12 - OPINION AND ORDER

1    Plaintiff's problems persisted thereafter, and in mid-June
2  2013, Plaintiff informed the medical staff that "[t]he only thing
3  that works is methadone." (Digiulio Decl. Attach. 2 at 42.) Also
4  in mid-June 2013, the TLC committee approved Plaintiff's use of
5  Baclofen for managing his chronic pain. (Digiulio Decl. Attach. 2
6  at 42, 250-51.) About a month later, on July 16, 2013, Plaintiff
7  reported that he "really noticed difficulty [that day] without
8  Baclofen." (Digiulio Decl. Attach. 2 at 43.) By early September
9  2013, however, Plaintiff began experiencing swelling in his right
10 foot and requested the return of his wheelchair, an extra pillow
11 and an increase in pain medication. (Digiulio Decl. Attach. 2 at
12 46.) Around the same time, Digiulio was consulted and declined to
13 alter Plaintiff's pain medications. (Digiulio Decl. Attach. 2 at
14 281.)

15    Plaintiff had an x-ray taken of his right foot the following
16 day, September 5, 2013, which showed signs of arthritis. (Digiulio
17 Decl. Attach. 2 at 47.) During follow-up visits in late September
18 2013, Plaintiff complained of continued pain and swelling in his
19 right leg and the inadequacy of his pain medications, and he once
20 again reiterated that morphine and methadone had "worked" in the
21 past. (Digiulio Decl. Attach. 2 at 48.) Plaintiff was told to
22 continue taking the medications prescribed and he was educated on
23 the benefits of walking and consuming an adequate amount of
24 protein. (Digiulio Decl. Attach. 2 at 48.)

25    Plaintiff was ultimately released from DRCI on transitional
26 leave on November 19, 2013, and provided with a month's supply of
27 Lipitor, Elavil, Amlodipine, Tamsulosin, Bacolfen, and Tramadol.
28 (Digiulio Decl. ¶ 3, Attach. 2 at 261.) On December 10, 2013,

Page 13 - OPINION AND ORDER

1    Defendants filed their motion for summary judgment, and the Clerk
2    of Court mailed Plaintiff a summary judgment advice notice and
3    scheduling order three days later, on December 13, 2010.  Over a
4    month later, on January 21, 2014, the Court granted Plaintiff's
5    motion to extend the deadline in which to file a response brief to
6    March 17, 2014.  The motion is now fully briefed.

7                           **II. LEGAL STANDARD**

8         Summary judgment is appropriate "if pleadings, the discovery
9    and disclosure materials on file, and any affidavits show that
10   there is no genuine issue as to any material fact and that the
11   movant is entitled to judgment as a matter of law."  FED. R. CIV.
12   P. 56(c).  Summary judgment is not proper if factual issues exist
13   for trial.  *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.
14   1995).

15        The moving party has the burden of establishing the absence of
16   a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477
17   U.S. 317, 323 (1986).  If the moving party shows the absence of a
18   genuine issue of material fact, the nonmoving party must go beyond
19   the pleadings and identify facts which show a genuine issue for
20   trial.  *Id.* at 324.  A nonmoving party cannot defeat summary
21   judgment by relying on the allegations in the complaint, or with
22   unsupported conjecture or conclusory statements.  *Hernandez v.*
23   *Spacelabs Med., Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).  Thus,
24   summary judgment should be entered against "a party who fails to
25   make a showing sufficient to establish the existence of an element
26   essential to that party's case, and on which that party will bear
27   the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

28

Page 14 - OPINION AND ORDER

1    The court must view the evidence in the light most favorable
2    to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d
3    1278, 1284 (9th Cir. 1982).    All reasonable doubt as to the
4    existence of a genuine issue of fact should be resolved against the
5    moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976).
6    Where different ultimate inferences may be drawn, summary judgment
7    is inappropriate. *Sankovich v. Life Ins. Co. of N. Am.*, 638 F.2d
8    136, 140 (9th Cir. 1981).    However, deference to the nonmoving
9    party has limits.    The nonmoving party must set forth "specific
10   facts showing a genuine issue for trial." FED. R. CIV. P. 56(e).
11   The "mere existence of a scintilla of evidence in support of
12   plaintiff's positions [is] insufficient." *Anderson v. Liberty*
13   *Lobby, Inc.*, 477 U.S. 242, 252 (1986).    Therefore, where "the
14   record taken as a whole could not lead a rational trier of fact to
15   find for the nonmoving party, there is no genuine issue for trial."
16   *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S.
17   574, 587 (1986) (internal quotation marks omitted).

18                            **III. DISCUSSION**

19       As previously stated, Plaintiff's § 1983 claim alleges a
20   violation of the Eighth Amendment arising from allegedly inadequate
21   medical treatment, on a theory of deliberate indifference to
22   serious medical needs.  (Am. Compl. at 4.) Defendants contend that
23   they are entitled to summary judgment "because the undisputed facts
24   demonstrate that while [Plaintiff's] wheelchair was indeed
25   discontinued, the discontinuation was ordered for medically sound
26   reasons for the benefit of the Plaintiff and certainly not out of
27   deliberate indifference to his pain or other serious medical
28   needs."  (Defs.' Mot. at 1.)

Page 15 - OPINION AND ORDER

1   "In the Ninth Circuit, the test for deliberate indifference
2   [to medical need] consists of two p[rong]s." *Jett v. Penner*, 439
3   F.3d 1091, 1096 (9th Cir. 2006).  "First, the plaintiff must show
4   a serious medical need by demonstrating that failure to treat a
5   prisoner's condition could result in further significant injury or
6   the unnecessary and wanton infliction of pain.  Second, the
7   plaintiff must show the defendant's response to the need was
8   deliberately indifferent." *Wilhelm v. Rotman*, 680 F.3d 1113, 1122
9   (9th Cir. 2012) (citation omitted); *Crowley v. Bannister*, 734 F.3d
10  967, 978 (9th Cir. 2013) ("A prison official violates the Eighth
11  Amendment when he acts with 'deliberate indifference' to the
12  serious medical needs of an inmate.").

13      "Examples of conditions that are 'serious' in nature include
14  'an injury that a reasonable doctor or patient would find important
15  and worthy of comment or treatment; the presence of a medical
16  condition that significantly affects an individual's daily
17  activities; or the existence of chronic and substantial pain.'"
18  *Green v. Bannister*, NO. 3:12-CV-00004-LRH, 2014 WL 281293, at *6
19  (D. Nev. Jan. 23, 2014) (citation omitted).  The second prong, on
20  the other hand, requires showing (1) "a purposeful act or failure
21  to respond to a prisoner's pain or possible medical need," and (2)
22  "harm caused by the indifference." *Wilhelm*, 680 F.3d at 1122.
23  "Indifference 'may appear when prison officials deny, delay or
24  intentionally interfere with medical treatment, or it may be shown
25  by the way in which prison officials provide medical care."
26  *Crowley*, 734 F.3d at 978 (citation omitted).

27      Here, it should be noted at the outset that, on two occasions,
28  Cazier's declaration erroneously refers to the year Plaintiff's

Page 16 - OPINION AND ORDER

wheelchair was confiscated as 2012 instead of 2010. (Cazier Decl. ¶¶ 10, 12.) However, the remaining paragraphs in Cazier's declaration, the abundance of progress notes maintained by the ODOC, and the allegations set forth in Plaintiff's amended complaint all reveal that these were typographical errors and that Plaintiff's wheelchair was in fact confiscated during mid-October 2010.

For example, the ODOC's progress notes indicate that the wheelchair was confiscated on October 12, 2010, returned in the early morning hours the next day after Plaintiff was educated on the proper use of the wheelchair, and then confiscated for a second time later in the evening on October 13, 2010, after Cazier "received [an] order to D/C wheelchair [from] Dr. Digiulio." (Digiulio Decl. Attach. 2 at 12.) In addition, the amended complaint Plaintiff filed on August 31, 2012, clearly alleges that "Dr. Degulio [sic] disallowed the plaintiff's use of his wheelchair on October 15, 2010, and therefore [it] was confiscated by Nurse Cazier."[7] (Am. Compl. at 6.)

Plaintiff did not submit his own evidence in opposition to summary judgment, choosing instead to devote a large portion of his brief to presenting rhetorical questions and arguments challenging the veracity of Defendants' statements to the Court.[8] The problem for Plaintiff is that his rhetorical questions and arguments are

_____

[7] The initial *pro se* complaint filed by Plaintiff on July 5, 2012, recites the exact same allegation. (Compl. at 6.)

[8] Again, the Clerk of Court mailed Plaintiff a summary judgment advice notice on December 13, 2013, and Plaintiff's response brief was not due until March 17, 2014.

contingent upon the Court construing the facts at the summary judgment stage in a manner consistent with the two typographical errors in Cazier's declaration. (*See, e.g.,* Pl.'s Resp. Br. at 3, "How then could [Digiulio] have in fact physically written the Physicians Order on October 13, 2010[,] [w]hen Defendants weren't even notified of the matter of Plaintiff still having his wheelchair until October 13, 2012?") The Court declines to adopt a clearly erroneous date for confiscation of Plaintiff's wheelchair.[9]

It should also be noted that Defendants represent to the Court that the ODOC's records fail to disclose whether the wheelchair in question belonged to Plaintiff or the ODOC. As Digiulio stated in his declaration: "[Plaintiff] arrived at DRCI in a wheelchair but ownership is not clear from ODOC records. [Plaintiff] reported to me on September 3, 2010 that he was given the wheelchair at the Intake Center but later reported he had it when he went to county jail." (Digiulio Decl. ¶ 13; *see also* Cazier Decl. ¶ 14.) According to Defendants' counsel, "[i]n light of the unresolved question about the original ownership of the wheelchair, the Plaintiff should be given the benefit of the doubt. Defendants *ex*

---

[9] Plaintiff seeks compensatory damages in the amount of $1,500 per day for the "730 days at DRCI," which results in a total of $1,095,000 in compensatory damages. On the Court's count, 728 days had elapsed between Plaintiff's transfer to DRCI on September 3, 2010, and the filing of an amended complaint on August 31, 2012. If the Court were to assume that Plaintiff's wheelchair was not confiscated until October 2012, it would reduce any potential damages period by two years. It would also raise concerns about whether Plaintiff had a good faith basis for allegations made in the pleadings.

Page 18 – OPINION AND ORDER

1  *rel* the Department of Corrections will compensate the Plaintiff for
2  the value of the wheelchair." (Defs.' Mem. Supp. at 11.)

3      Per Judge Brown's second screening order dated October 15,
4  2012, this § 1983 action was to proceed as a single Eighth
5  Amendment claim against Defendants. Nevertheless, the Court agrees
6  that this *pro se* plaintiff should be given the benefit of the doubt
7  and that he should be compensated by the ODOC for the wheelchair,
8  as proposed by Defendants' counsel. In the event the ODOC fails to
9  do so within thirty days of this Opinion and Order, the Court notes
10  that it would consider a motion to set aside a judgment as well as
11  a subsequent motion for leave to file a second amended complaint,
12  *nunc pro tunc*, for conversion of personal property.

13      That said, Plaintiff's remaining Eight Amendment claim
14  involves choices between alternative courses of treatment——namely,
15  a course of treatment that includes the use of a wheelchair and one
16  that does not. In the Eighth Amendment context, "a mere
17  'difference of medical opinion . . . [is] insufficient, as a matter
18  of law, to establish deliberate indifference.'" *Toguchi v. Chung*,
19  391 F.3d 1051, 1058 (9th Cir. 2004) (quoting *Jackson v. McIntosh*,
20  90 F.3d 330, 332 (9th Cir. 1996)). Instead, "to prevail on a claim
21  involving choices between alternative courses of treatment, a
22  prisoner must show that the chosen course of treatment 'was
23  medically unacceptable under the circumstances,' and was chosen 'in
24  conscious disregard of an excessive risk to [the prisoner's]
25  health.'" *Id.*

26      *Allee v. Oregon Dep't of Corrections*, NO. 06-CV-187-JE, 2007
27  WL 2417390 (D. Or. Aug. 21, 2007), is an illustrative example of a
28  case involving choices between alternative courses of treatment.

Page 19 - OPINION AND ORDER

There, a prisoner sought medical attention on several occasions for pain and reduced range motion in his knees. *Id*. at *2. Although the plaintiff was treated with pain medication, anti-inflammatories and physical therapy, *id.*, he claimed that the defendants violated his Eighth Amendment rights by denying him the use of a cane and wheelchair, *id.* at *5. The district court ruled in the defendants' favor and the Ninth Circuit affirmed on appeal, stating: "The district court properly granted summary judgment on Allee's Eighth Amendment claim regarding a knee injury, because Allee failed to controvert defendants' medical evidence showing that Allee's condition might improve with increased walking, and that a wheelchair and cane were not medically necessary." *Allee v. Or. Dep't of Corr.*, 315 F. App'x 610, 612 (9th Cir. 2009).

Similarly, in this case, Plaintiff has failed to controvert Defendants' medical evidence showing that Plaintiff's condition might improve with increased walking with the assistance of a cane, and that a wheelchair was not medically necessary. Digiulio testified that he recommended a plan of care to discontinue the wheelchair so Plaintiff "could improve his mobility by walking and using a cane." (Digiulio Decl. ¶¶ 12, 14.) What's more, Digiulio's review of clinical literature suggests that non-narcotic measures associated lifestyle changes, such as weight loss, yoga, exercise and stretching (i.e., the type of activities recommended to Plaintiff), can be as effective as narcotic medications in treating chronic pain. (Digiulio Decl. ¶ 23.) Likewise, Short did not recommend a wheelchair when Plaintiff presented for an orthopedic consultation. (*See* Digiulio Decl. Attach. 2 at 250.)

1    It is also important to note that just five days prior to

2    Plaintiff's September 8, 2010 consultation with Digiulio (i.e.,

3    when the decision was initially made to discontinue Plaintiff's use

4    of a wheelchair), Plaintiff sent an inmate communication form a to

5    a "Dr. Perini," stating: "I have . . . approval for Shutter Creek

6    AIP [p]roviding I get your approval as its [sic] not wheelchair

7    friendly, [and] I can walk on a cane." (Digiulio Decl. Attach. 2

8    at 382.)  Plaintiff complained to a nurse at DRCI three months

9    later about wanting "clearance to do stairs" because he wanted to

10   be transferred to the non-wheelchair-accessible Shutter Creek AIP.

11   (Digiulio Decl. Attach. 2 at 14.)

12       To conclude, "[d]eliberate indifference is a high legal

13   standard. A showing of medical malpractice or negligence is

14   insufficient to establish a constitutional deprivation under the

15   Eighth Amendment." *Toguchi*, 391 F.3d at 1060.  "Even gross

16   negligence is insufficient to establish deliberate indifference to

17   serious medical needs." *Lemire v. Cal. Dep't of Corr. & Rehab.*,

18   726 F.3d 1062, 1074 (9th Cir. 2013).  The record evidence in this

19   case, even when viewed in the light most favorable to Plaintiff,

20   falls short of a showing of medical malpractice or negligence, let

21   alone gross negligence or a "medically unacceptable" course of

22   treatment "chosen in conscious disregard of an excessive risk" to

23   Plaintiff's health.  Motion granted.

24                          **IV. CONCLUSION**

25       For the reasons stated, the Court hereby orders as follows:

26   (1) in accordance with Defendants' counsel's representations to the

27   Court, the ODOC shall compensate Plaintiff for the value of the

28   wheelchair within thirty (30) days of this Opinion and Order; and

Page 21 - OPINION AND ORDER

1  (2) Defendants' motion (Docket No. 49) for summary judgment on
2  Plaintiff's remaining Eight Amendment claim is granted and this
3  action is dismissed with prejudice.

4      IT IS SO ORDERED.

5      Dated this  3rd  day of December, 2014.

6                                    /s/ Dennis J. Hubel
                                   _____
7                                    DENNIS J. HUBEL
                                 United States Magistrate Judge
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28